# United States Court of Appeals
## For the First Circuit

No. 24-1656

LINDA CRAWFORD,

Plaintiff, Appellant,

v.

SALVE REGINA UNIVERSITY; SALVE REGINA UNIVERSITY BOARD OF
TRUSTEES, through its President, Dr. Kellie J. Armstrong;
JAMES G. MITCHELL, Chair, SRU Department of Modern Languages and
President, Salve Regina AAUP CCHP; ESTHER ALARCON-ARANA,
Faculty, SRU Department of Modern Languages;
EMILY COLBERT-CAIRNS, Faculty, SRU Department of Modern
Languages,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary S. McElroy, U.S. District Judge]

Before

Barron, Chief Judge,
Gelpí and Aframe, Circuit Judges.

Stephen T. Fanning for appellant.
Joseph D. Whelan, with whom Sara A. Rapport, and Whelan
Corrente & Flanders LLP, were on brief for appellees.

June 11, 2026

**GELPÍ, Circuit Judge.**  Dr. Linda Crawford was a tenured professor at Salve Regina University (the "University") who was fired in 2022.  She brought this action against the University and its Board of Trustees, alleging that her firing was motivated by unlawful discrimination and retaliation in violation of federal and state law.  She also brought related state tort and contract claims against them and some of her former colleagues.  The district court dismissed Crawford's discrimination claims for failure to state a claim and declined to exercise supplemental jurisdiction over the state tort and contract claims.  We now **affirm**.

## I. Background

### A. Factual Background[1]

Crawford was a tenured Spanish professor in the University's Modern Languages Department from 2004 until her termination in 2022.  In the years preceding her termination, she "maintained a positive record of employment," with her evaluations showing "no negative trends in her performance or deviations [from] . . . her teaching responsibilities."

---

[1] "We draw the facts from the plaintiff['s] complaint" and from "documents attached to or fairly incorporated into the complaint."  Better Way Ford, LLC v. Ford Motor Co., 142 F.4th 67, 77 (1st Cir. 2025) (citation modified).

The events relevant to this appeal begin on November 15, 2021.  On that day, Crawford taught a class on Spanish American Culture and Civilization focused on Gender and Sexuality in Latin America.  In preparation for the class, Crawford had assigned a reading that contained the word "trans[vestites],"[2] and, in class, led a brief discussion on LGBTQ+ rights in Latin American countries, noting "that these rights have not evolved to the level such rights have evolved [to] in the United States."  During class, a student identified as "Student D" became upset.  He objected to the terminology used in the assigned reading and "had an outburst in class."

Afterward, some of the students who were upset met with Modern Languages Department Chair James G. Mitchell ("Mitchell") to discuss the incident.  During the meeting, Mitchell "encouraged and/or directed the students to submit written statements to the [U]niversity criticizing" Crawford.  Crawford alleges that Mitchell coordinated these student complaints "to retaliate

---

[2] In paragraph 27 of the complaint, Crawford alleges that the assigned reading used the word "transgender," and that Student D objected to the term "transgender."  This appears to be a typographical error because earlier in the complaint she alleges that the reading to which the students objected used the word "transvestites."  Moreover, in the letter that Student D wrote about Crawford, he described himself as a "transgender gay man."  The district court also thought this was a typographical error.  Crawford v. Salve Regina Univ., No. 1:23-CV-00380, 2024 WL 3046404, at *2 n.1 (D.R.I. June 18, 2024).

against" her based on prior disagreements and a prior grievance against him. And she alleges that this was not an isolated event. At the start of the semester, Mitchell and the University Provost had instructed undergraduate students to "keep a running list of criticisms" about her.

Several students followed Mitchell's suggestion and submitted written complaints to the University. Student D wrote a lengthy letter to the Provost explaining his view that the reading using the word "transvestite" was "inappropriate." Student D wrote that he had told Crawford "he was a 'transgender gay man,'" and that because she "is a white straight cis[3] woman," she cannot tell him what he finds offensive. Student D then asked the Provost to "take action" against Crawford, whom he described as "ignorant." Another student, Student C, wrote that he was "directed by an advisor," who Crawford identifies as Mitchell, to email the Provost about "derogatory language regarding transgender people in [Crawford's] class." Student C reported that he found the language at issue to be "triggering" and opined that the classroom should be a "warm and safe space."

---

[3] "Cis" is short for "cisgender," which is an adjective describing a person whose gender identity corresponds with the sex registered for them at birth.

Crawford cites the similar "tone and content" of the student complaints as "indicating that they were the product of a deliberately coordinated effort . . . to unfairly undermine [Crawford's] reputation and denigrate her performance." She also characterizes "certain students" as taking "the position that [she] had no right to teach about certain cultural norms in Latin America because she was [a] 'cis white woman.'"

After receiving these complaints, the University held a group Zoom meeting for students to share what had occurred in Crawford's classes that semester. Some students described Crawford as using "offensive language and hateful rhetoric" towards the LGBTQ+ community and people of color. The University did not inform Crawford of the meeting or permit her to participate. It also never properly investigated or verified any of the allegations.

On November 22, 2021, the University's Title IX Coordinator emailed Crawford a "Notice of Interim Action." According to the Notice, students alleged that Crawford had made derogatory comments toward "a population based on that population['s] . . . gender identity or expression" and expressed that they did "not feel safe around" Crawford. The Notice restricted some of her duties but stated that it should not be construed to indicate that the University had taken any

disciplinary action against her.  Crawford does not recall receiving the Notice but suggests it is evidence that the University completed its investigation in "less than a week" without giving her an opportunity to respond.

On January 3, 2022, six weeks later, the University informed Crawford that her employment was terminated "for cause." The University cited "continued misconduct," "failure to communicate," and "failure to comply with the requirements of a faculty member in accordance with the Faculty Manual."  Per Crawford, the University President described the November 15, 2021 class as the "catalyst" for the termination, but went on to "falsely assert that the past seven years of [her] employment ha[d] been 'fraught' with misconduct in the classroom and unacceptable teaching practices . . . ."

Next, Crawford appealed her termination to the Faculty Hearing Board ("Faculty Board"), which ultimately upheld the decision.  Crawford maintains that the appeals proceeding was prejudiced and driven by an intent to destroy her career because certain individuals disliked her teaching methods or believed she had no right to teach certain topics.  Crawford describes the proceedings as an "ex post facto effort to lend an air of legitimacy to an unsupportable discharge decision."  To support that contention, she points to several procedural irregularities.

First, the University did not follow the American Association of University Professors' recommended institutional protocols and regulations pertaining to involuntary terminations of faculty appointments. Second, before the Faculty Board heard her appeal, her email account was deactivated, and she could not access messages to prepare for the hearing. Third, she was not allowed to have an advisor or legal counsel speak on her behalf. And, lastly, unsworn and "unreliable" testimony from faculty and students was collected haphazardly, without gathering the views of all members of the community.

In addition to these alleged procedural defects, Crawford alleges that some of her colleagues in the Modern Languages Department submitted false and defamatory statements. Esther Alarcon-Arana wrote that Crawford made transphobic, homophobic, antisemitic, and xenophobic comments; that Crawford's focus was to undermine the Modern Languages Department; that she bad-mouthed male colleagues; and that students "refused to be in [Crawford's] class." And Emily Colbert-Cairns wrote that Crawford "s[o]wed acrimony" among students, faculty, and staff, and that she made antisemitic remarks.[4]

---

[4] Crawford objects to her colleagues' statements because they "created the impression that she is an adherent of hate and intolerance," which contravenes her Christian values and beliefs.

The Faculty Board's decision was 3-2. The majority opinion first addressed the procedural issues with the investigation, and it acknowledged that some evidence was "collected prejudicially" -- some of the collected information was biased and "was not solicited in an independent way but more haphazardly and unchecked." But the majority opinion attributed the procedural issues to "ill-conceived dismissal procedure[s] that [were] greatly out of date" -- not a complete function of prejudice against Crawford.

On the merits of the termination, the majority concluded that Crawford "regularly and routinely use[d] derogatory language that minimize[d] others and promote[d] hurtful stereotypes." Although it recognized that her in-class lessons were crafted to explore the nature of stereotypes and foster educational dialogue, it determined that Crawford lacked "the training to teach these controversial topics in a way that le[d] to transformative interactions with students." The majority thus believed that the issues were "not taught in a culturally responsive manner."

Next, the Faculty Board wrote that "Crawford show[ed] regular patterns of abandonment in her teaching or interaction with students." There were longstanding concerns about Crawford's lack of responsiveness to students, colleagues, and administrators. The Faculty Board was also troubled by Crawford's

participation-based grading practices, noting student complaints over the years about her methods and lack of transparency had gone unaddressed. And it expressed concern about her classroom practices, including Crawford's use of class time to discuss her personal life without an apparent pedagogical reason.

The minority opinion disagreed with Crawford's termination. It acknowledged that Crawford "had a pattern of relationship problems over the years with every level of the [U]niversity -- with some students, the majority of her faculty colleagues in the Modern Languages [D]epartment, and the entirety of the present undergraduate academic affairs administration." But it opined that firing her was not the "proper way to solve the problem" and that the process had been unfair and unreasonable.

The minority opinion went on to explain that evidence was collected from a biased sample of students and colleagues; student feedback and other objective performance measures were cherrypicked to support dismissal; the November 15, 2021 class discussion incident was unfairly "characterized as a one-way, unilateral failure on the part of the professor, with no critical exploration of student reactions to" the controversial reading; and the University did not substantively respond to Crawford's presented evidence, which "undercut[] the legitimacy of [its] charges." The minority characterized the administration's

approach to the termination process as: "We need to dismiss Dr. Crawford; these are the categories available to us to do so; let us try to wedge Dr. Crawford's problems into these categories as best we can." But in the minority's view, none of the evidence proffered by the University supported the criteria it cited as cause for removal. Lastly, the minority flagged the "sad irony" that one of Crawford's colleagues in the Modern Languages Department "could have justifiably been 'fired for cause' on grounds that were publicly known (newspaper stories and police reports)" but received mercy. In the minority's view, Crawford was someone with "less 'cause'" who "d[id] not even receive justice."

Crawford appealed the Faculty Board's decision to the University's Board of Trustees, which affirmed the termination unanimously. The University "replaced [Crawford] with respect to at least part of her teaching schedule with a male significantly younger than [her] who is believed to be the husband of Defendant Alarcon-Arana."

To support an age discrimination claim, Crawford also asserts that unidentified individuals referred to her "as 'old school'" because she requested that students use her title and not her first name; that a student requested a different advisor with "fresh ideas and perspectives"; that she was "criticized" "for not

using gender neutral endings in Spanish and told this was because she was 'older'"; and that the University did not provide office assignments by seniority, instead providing favorable spaces to younger/junior faculty members.

## B. Procedural Background

On June 7, 2023, Crawford filed a verified complaint[5] in Rhode Island Superior Court against the University, the Board of Trustees, and her former colleagues (Mitchell, Alarcon-Arana, and Colbert-Cairns). She alleged breach of contract, various torts (defamation, tortious interference with a contractual relationship, and intentional infliction of emotional distress), and violations of federal and state anti-discrimination law related to her termination.[6] The University removed her case to the United States District Court for the District of Rhode Island. Then, it moved to dismiss the entirety of the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

---

[5] A verified complaint is one where the plaintiff swears to the factual allegations contained therein.

[6] Crawford asserted anti-discrimination claims under five statutes: the Rhode Island Civil Rights Act ("RICRA"), R.I. Gen. Laws § 42-112-1 et seq.; the Rhode Island Fair Employment Practices Act ("FEPA"), R.I. Gen. Laws § 28-5-1 et seq.; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000 et seq.; Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 et seq.; and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.

- 11 -

The district court granted the University's motion to dismiss as to Crawford's federal and state anti-discrimination claims. It reasoned that she failed to allege any nexus between her protected categories and the University's decision to terminate her employment. Then, it declined to exercise supplemental jurisdiction over Crawford's remaining state-law claims and remanded those claims to Rhode Island Superior Court. Crawford timely appealed the dismissal.

## II. Discussion

"We review the grant of a motion to dismiss de novo." Better Way Ford, LLC v. Ford Motor Co., 142 F.4th 67, 77 (1st Cir. 2025) (citation modified). In doing so, we accept as true all well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. Id. We need not, however, credit conclusory allegations. Id.

To survive a motion to dismiss, a plaintiff need only plead facts that make the claim plausible. See Carrero-Ojeda v. Autoridad De Energía Eléctrica, 755 F.3d 711, 717-18 (1st Cir. 2014); Rodríguez-Reyes v. Molina-Rodríguez, 711 F.3d 49, 53 (1st Cir. 2013). Although plausibility is necessary, see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), "there is no requirement to plead a complete prima facie case of liability," DeAngelis v. Hasbro, Inc., 165 F.4th 646, 652-53 (1st Cir. 2026); see also

- 12 -

Rodríguez-Reyes, 711 F.3d at 54 ("It is not necessary to plead facts sufficient to establish a prima facie case at the pleading stage."); Garayalde-Rijos v. Municipality of Carolina, 747 F.3d 15, 24 (1st Cir. 2014) ("We have explicitly held that plaintiffs need not plead facts in the complaint that establish a prima facie case under Title VII . . . .").

That said, "the elements of a prima facie case may be used as a prism to shed light upon the plausibility of the claim." Rodríguez-Reyes, 711 F.3d at 54; see also, e.g., Carrero-Ojeda, 755 F.3d at 718. Thus, we consider whether the complaint sets forth sufficient allegations to make out plausible claims of discrimination, hostile work environment, and retaliation claims and use the elements of a prima facie case for each claim only as is useful in making that determination. See DeAngelis, 165 F.4th at 653; see also Rodríguez-Reyes, 711 F.3d at 54 (noting that the elements of a prima facie case of liability remain relevant to the plausibility assessment because they form "part of the background against which [the] plausibility determination should be made"). The most important of these considerations is whether Crawford has alleged facts that make it plausible that there is a causal connection between Crawford's alleged protected class and the alleged adverse action.

With that framework in mind, we address Crawford's several arguments on appeal. First, she raises a threshold procedural challenge: that the district court improperly relied on documents outside the complaint and thereby converted the motion to dismiss into one for summary judgment without proper notice. On the merits, she renews her contentions that she sufficiently pleaded that she was discriminated against and unlawfully terminated based on protected characteristics; subjected to a hostile work environment on the basis of those characteristics; and terminated in retaliation for protected conduct. We address each argument seriatim.

## A. Extraneous Documents

As an initial matter, Crawford argues that the district court improperly relied on documents extraneous to the complaint in dismissing her case. Specifically, she challenges the district court's reliance on the University's Faculty Manual and the Faculty Board's majority and minority opinions.

Generally, when a "district court considers 'matters outside the pleadings' on a motion to dismiss under Rule 12(b)(6), 'the motion must be treated as one for summary judgment under Rule 56.'" Irizarry Sierra v. Bisignano, 158 F.4th 43, 49 (1st Cir. 2025) (quoting Fed. R. Civ. P. 12(d)). But "there is a narrow exception for documents -- the authenticity of which is not

challenged -- that are central to the plaintiff's claim or sufficiently referred to in the complaint . . . ." Carrero-Ojeda, 755 F.3d at 717 (citing Alt. Energy, Inc. v. St. Paul Fire and Marine Ins., 267 F.3d 30, 33 (1st Cir. 2001)). If a document falls under this exception, it merges into the pleadings, and a district court may properly consider it without converting a motion to dismiss into a motion for summary judgment. Irizarry Sierra, 158 F.4th at 49. Otherwise, plaintiffs could frustrate "the district court's inquiry into the feasibility of a complaint" by omitting critical documents from it. Id.

This exception applies here. Crawford does not dispute the authenticity of the University's Faculty Manual or the Faculty Board's majority and minority opinions; and indeed, she conceded that they are "arguably incorporated in the [c]omplaint." The complaint repeatedly references or quotes these materials, and they are central to her claims. The district court therefore properly considered them without converting the motion to dismiss into a motion for summary judgment. As do we.

## B. Discrimination Claims

We proceed with Crawford's substantive claims. She maintains that the University and Board of Trustees discriminated against her based on her gender, race, sexual orientation, age,

- 15 -

and religion in violation of RICRA, FEPA, Title VII, Title IX, and the ADEA.[7]

To make the required showing, Crawford points to a mix of student comments, alleged hostility from her Department Head, and criticism of her and her teaching as suggestions of discriminatory animus. The complaint, however, either fails to attribute the alleged animus to the University's decisionmakers or fails to provide any factual detail to support animus based on her protected characteristics. Let us explain.

First, Crawford points to Student D's reference to her as a "cis [w]hite woman" to suggest that "faculty and students . . . harbored an animus towards her" based on her gender, sexual orientation/identification, and race. But Student D did not participate in the termination decision, so his

---

[7] Crawford's theory of causation mostly rests on conclusory assertions rather than well-pleaded factual allegations. For example, on religion and sexual orientation, Crawford's only factual allegations are that she is Christian and heterosexual. But she offers no facts connecting either trait to the University's decision to fire her. Conclusory assertions do not suffice absent supporting facts that plausibly connect her protected characteristics to the University's termination decision. See Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) ("Dismissal . . . is appropriate if the complaint fails to set forth 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'" (citation omitted)). We thus further narrow our focus to the few well-pleaded facts and explain why they fail to state a claim.

bias alone does not plausibly give rise to an inference of discrimination by the entity that effected the challenged adverse action -- the University.

The fact that Student D submitted his complaint to University officials before Crawford was terminated does not change that outcome because the complaint supplies no facts suggesting that the decisionmakers referenced Student D's language when deciding to fire her, endorsed his characterization of Crawford, or acted for reasons tied to her protected traits. In fact, the University supplied independent reasons to terminate her. Crawford does allege those reasons were pretextual. (And that the University engaged in multiple procedural irregularities to mask its true motives.) We accept that factual allegation as true at this stage. But that does not mean we must credit Crawford's unreasonable inferences from it. See Butler v. Deutsche Bank Tr. Co. Ams., 748 F.3d 28, 32 (1st Cir. 2014) ("[Our] deferential review . . . does not require that we accept the complaint wholesale; 'bald assertions' and 'unsupportable conclusions' are properly disregarded." (quoting Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996)). While the University's stated reasons may or may not have been pretextual, none of

Crawford's pleaded facts suggest that it was plausibly masking discriminatory animus.[8]

Start with her claims about her Department Head, Mitchell. Crawford maintains that he sought to retaliate against her for "a protracted history of disagreements" and her prior grievance against him. And that he "directed" students to submit criticisms of her to the University (criticisms that ultimately referenced some of Crawford's protected characteristics). But Crawford provides no context about her disagreements with Mitchell or her grievance's nature -- no facts from which we could assess

---

[8] Crawford's complaint points to various procedural irregularities, and both the majority and minority opinions from the Faculty Board affirming the President's decision to dismiss Crawford admitted as much. But even the minority opinion, to which Crawford points in her complaint, does not include any indication that the procedural irregularities masked discriminatory motives. Instead, the minority opinion "acknowledge[d] that Dr. Crawford has had a pattern of relationship problems over the years with every level of the university -- with some students, the majority of her faculty colleagues in the Modern Languages department, and the entirety of the present undergraduate academic affairs administration," noting that the fact that "she finds herself in wide-ranging tension, even conflict, with various members of the Salve community, is not by itself an indication of fault on her part in every instance" but her continual presence "in the middle of such tensions, however, does pose a problem for the institution." Thus, while "procedural irregularities may be relevant in identifying . . . discrimination," they "are not inevitably a sign of [protected-class] bias" and may instead reflect ineptitude, inexperience, or non-discriminatory motives. Doe v. Stonehill Coll., Inc., 55 F.4th 302, 334 (1st Cir. 2022). Without facts linking those irregularities to discriminatory motive -- which is lacking in Crawford's complaint and brief to us -- the procedural issues do not support a plausible inference of discrimination.

whether they bore any relationship to her protected characteristics. Nor does she allege facts suggesting that Mitchell encouraged students to submit criticisms that were animus based, rather than to raise legitimate pedagogical concerns.[9]

Second, Crawford suggests that she was actually fired because "certain individuals" disliked her teaching methods, or perhaps more generally disliked her. But dislike of her teaching methods of personality is not, without more, indicative of discrimination. And because Crawford fails to identify who these individuals are, the allegations remain untethered to the decisionmakers who decided to terminate her employment.

Third, Crawford suggests that she was fired because "students" and "certain individuals" objected to her teaching "at all in certain subject areas" because she is a "cis white woman." That theory does implicate her protected characteristics, but it is not supported by any factual detail. The complaint does not identify who made any such statements, what was said, when the statements were made, or whether they were communicated to -- or relied upon by -- any decisionmaker. As pleaded, this is a

---

[9] Crawford also seems to point to the fact that Mitchell is male as suggesting gender discrimination. But the mere fact that a male decisionmaker terminated a female employee does not, standing alone, substantiate a claim of gender discrimination. Rivas Rosado v. Radio Shack, Inc., 312 F.3d 532, 534 (1st Cir. 2002).

conclusory allegation that we need not credit at the motion to dismiss stage.  See Better Way Ford, LLC, 142 F.4th at 77.

Crawford next attempts to show animus through disparate treatment, alleging that she was the "first and only tenured full professor subject to termination proceedings."  And that a male administrator in the Modern Languages Department was "allowed . . . to 'step down' from his position and awarded . . . full tenure, two sabbaticals and several course reductions" despite his involvement in a "concerning legal matter."  But she supplies no facts about the "concerning legal matter," the nature or severity of the misconduct, or whether it was comparable to the conduct attributed to Crawford.  So we cannot determine whether the proposed comparator closely resembles Crawford in relevant respects such that we could infer gender-based discrimination.  See, e.g., Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190-91 (4th Cir. 2010) (affirming dismissal where "the complaint fails to establish a plausible basis for believing [the two comparator employees] were actually similarly situated [to the plaintiff] or that race was the true basis for [the plaintiff's] termination.").  Juxtaposing her gender with the male administrator's is not enough.

On age discrimination, Crawford alleges that she was replaced with a "significantly younger" male for "part of her

teaching schedule" and that the University assigned favorable office spaces to younger faculty but offers no factual details supporting these statements. Conclusory allegations need not be credited. See Better Way Ford, LLC, 142 F.4th at 77. She further alleges that she has been called "old school" for asking students to use her title and not her first name and that a student requested a different advisor with "fresh ideas and perspectives." But, once more, these statements come from either students or unidentified people, at unspecified points in time, and are not alleged to have been made by -- or in the presence of -- any decisionmaker responsible for Crawford's termination. So we cannot infer from them any nexus to her termination.

Because Crawford's discrimination claims are unsupported by factual detail or supported by details untethered to the University's termination decision, the district court properly dismissed them.

### C. Hostile Work Environment Claims

Crawford next contends that the University and the Board of Trustees subjected her to an unlawful hostile work environment related to her gender, race, sexual orientation, age, and religion in violation of RICRA, FEPA, Title VII, and the ADEA. Hostile work environment claims under these statutes are analyzed under the same substantive standard. See DeCamp, 875 A.2d at 21-23

(RICRA and FEPA); Franchina v. City of Providence, 881 F.3d 32, 46 (1st Cir. 2018) (Title VII); Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 91 (1st Cir. 2018) (ADEA). A plaintiff must ultimately prove that she (1) is a member of a protected class; (2) was subject to harassment; (3) the harassment was based on her membership in a protected class; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive work environment; (5) the harassment was both objectively and subjectively offensive; and (6) there exists some basis for employer liability. Tang v. Citizens Bank, N.A., 821 F.3d 206, 215-16 (1st Cir. 2016). However, at the motion to dismiss stage, we assess only whether Crawford has pleaded facts rendering her claim plausible. See Gorski v. N.H. Dep't of Corr., 290 F.3d 466, 472 (1st Cir. 2002).

For this claim, Crawford argues that her complaint outlines over twenty-five instances of egregious name-calling, insults, and accusations that were submitted to the University. These comments, according to Crawford, "included but were not limited to accusing [her] of using offensive language and severely hateful rhetoric towards the LGBTQ+ community and people of color; accusing her of using a transgender slur; accusing her of making racist comments; calling her a parasite; inhumane, and toxic." But none of these comments plausibly suggest harassment based on

Crawford's gender, race, sexual orientation, age, or religion. The students' and faculty's statements may reflect disagreement with -- or criticism of -- her views about certain minority groups. But it does not follow from that disagreement that Crawford's protected characteristics were targeted. See, e.g., Maraschiello v. City of Buffalo Police Dep't, 709 F.3d 87, 97 (2d Cir. 2013) ("[A] statement that someone is a 'racist' . . . does not indicate that the object of the statement is being rejected because of his race . . . . 'Racism' is not a race, and discrimination on the basis of alleged racism is not the same as discrimination on the basis of race.").[10] Thus, the district court correctly dismissed Crawford's hostile work environment claims. See Quiles-Quiles v. Henderson, 439 F.3d 1, 7-8 (1st Cir. 2006) ("An employee claiming harassment must demonstrate that the hostile conduct was directed at him because of a characteristic protected by a federal anti-discrimination statute." (emphasis added)); Gorski, 290 F.3d at 473 ("[A] complaint should be

_____

[10] Crawford maintains that it is inconsistent to remand her defamation claim while simultaneously concluding that the same facts are insufficient to state to a hostile work environment. But both claims involve different elements. Defamation does not require that statements target protected characteristics or alter employment conditions. See Acosta v. Madeira Rest. Inc., No. CV 19-093, 2019 WL 3084468, at *3 (D.R.I. July 15, 2019) (citing Nassa v. Hook-SupeRx, Inc., 790 A.2d 368, 373 n.10 (R.I. 2002) (outlining the elements of defamation under Rhode Island law).

dismissed under Fed. R. Civ. P. 12(b)(6) . . . if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." (citation modified)).

### D. Retaliation Claims

Lastly, Crawford claims that the University and Board of Trustees retaliated against her in violation of Title VII and Title IX. To prove retaliation under either statute must ultimately show that: "(1) she engaged in protected conduct; (2) she was subjected to an adverse employment action; and (3) the adverse employment action is causally linked to the protected conduct." Ing, 81 F.4th at 84 (quoting Theidon v. Harvard Univ., 948 F.3d 477, 505 (1st Cir. 2020)). "Protected conduct" includes (1) opposing a practice made unlawful under Titles VII or IX or (2) charging, testifying, assisting, or otherwise participating in an investigation, proceeding, or hearing under the relevant statutes. Ray v. Ropes & Gray LLP, 799 F.3d 99, 107-08 (1st Cir. 2015); 42 U.S.C. § 2000e-3(a). At the motion to dismiss stage, we assess whether Crawford has pleaded sufficient facts to render her retaliation claim plausible.

Crawford advances two theories of retaliation. First, she contends that she engaged in protected conduct by filing a grievance against Mitchell. But she does not describe the substance of the grievance itself or include any facts tending to

show that the grievance concerned conduct protected under Title VII or IX.

Second, she maintains that she participated in the University's disciplinary process when the allegations against her arose, and that it is plausible that the University terminated her in retaliation for defending herself and accusing it of unlawful conduct. Defendants counter that the Faculty Board's hearing occurred after her termination. Because Crawford did not contest that fact in her reply, we assume without deciding that Crawford's termination on January 3, 2022, was the adverse action at issue, notwithstanding that there was a later appeal to the Board of Trustees on June 27, 2022, that affirmed the decision of the Faculty Board. This is fatal to her claim because "no protected conduct after an adverse employment action can serve as the predicate for a retaliation claim." Pearson v. Mass. Bay Transp. Auth., 723 F.3d 36, 42 (1st Cir. 2013).

Because Crawford does not plead facts regarding any other instance where she opposed an unlawful employment practice or participated in a statutory investigation or proceeding, she failed to plausibly allege that she engaged in protected conduct preceding her termination, which is required to ultimately prove a retaliation claim.

- 25 -

### III. Conclusion

For the foregoing reasons, we **affirm** the district court's judgment.